NO. 4-95-0881

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from

Plaintiff-Appellee,          ) Circuit Court of 

          v. ) Adams County

STEVEN A. HANNA,   ) No. 94CF427

          Defendant-Appellant. ) 

              ) Honorable

                    )    Mark A. Schuering,

                               )    Judge Presiding.

_________________________________________________________________

PRESIDING JUSTICE GARMAN delivered the opinion of the court: 

Following a jury trial in the circuit court of Adams County, defendant Steven Hanna was convicted of unlawful posses­sion of less than 200 grams of a substance containing methamphet­amine (720 ILCS 570/402(c) (West 1992)) and driving while his driver's license was revoked (DWR) (625 ILCS 5/6-303(a) (West 1992)).  He was sentenced to a term of six years' imprisonment on the drug convic­tion and a concurrent term of 364 days in jail on the DWR  convic­tion.  Defendant appeals, arguing that (1) the State failed to prove beyond a reasonable doubt that the substances found in his possession were in fact controlled substances; (2) a limited remand is necessary to determine whether he was denied due process of law by the failure to afford him a fitness hearing, where he was ingesting psychotrop­ic drugs during the pendency of the case; and (3) the trial court erred in ordering him to pay $300 toward the fees of his appointed counsel.  We affirm in part, vacate in part and remand.

After first waiving counsel, defendant requested that counsel be appointed for him.  At a hearing on this issue, defendant testified that he was self-employed in the automotive business, but his garage burned down and he was currently without any source of income.  The garage was not insured.  Due to injuries sustained in the fire, he is not able to work and is applying for disability payments.  His home is worth between $8,000 and $12,000 and he owes approximately $3,000 in past-due real estate taxes on it.  He also owns a vacant lot in joint tenancy with another person valued at approxi­mately $500.  He has a bank account with a balance of approximately $11.  He owes approxi­mately $5,000 to his father and approximately $4,500 to people who lost vehicles in his garage fire.  His wife posted his bond of $1,200.  She did not sign a bond assignment.  The trial court appointed counsel for defendant and advised him that should he gain income or assets, he could be required to repay the county for the cost of the public defender.   Defendant represented himself at trial, with his appointed counsel acting as standby counsel.  Testimony for the State indicated that defendant was seen driving a truck and a check of his driver's license revealed that it had been revoked.  Police officers arrested him at a donut shop.  He was handcuffed and officers conducted a custodial search.  In one of defendant's pockets, the officers found an open package of cigarettes.  Two cigarettes were in the package, but the officers noticed that the package felt heavier than it should with only two cigarettes in it.  The package contained a small vial with a screw cap, a small, clear plastic baggie with a whitish-brown powdery substance inside and a piece of newsprint commonly referred to as a "snow seal," which is usually used to carry illegal drugs.  Inside the snow seal was a whitish-brown powdery substance.  Such a substance is sometimes known to be methamphetamine.  Defendant told the officers the substance in the vial was his nitroglycerin.  He asked that a waitress at the donut shop keep all his personal effects, but the officers refused.  Prior to the search, defendant said he felt sick and asked to go to the bathroom, but that request was also refused.  One officer conducted a field test on the powdery substance.  The substance in the vial did not test positive for methamphet­amine, but the substances in the snow seal and baggie tested positive.

Nancy Antonaccio, a forensic scientist for the Illinois State Police who specializes in drug chemistry, testified that she performed preliminary and confirmatory tests on the substances.  The preliminary test indicated that a stimulant could be present.  She then performed an infrared spectrophotome­ter test, which is a confirmatory test, on each substance.  The substances all contained methamphetamine hydrochloride, which is a controlled substance.  An over-the-counter preparation, the "Vicks Inhaler,"  also contains methamphetamine.  It must be in the inhaler to be an exempted substance in Illinois.  

On cross-examination, Antonaccio stated that there are different isomers in methamphetamine, referred to as "D" and "L."  Those letter designations refer to the rotation of the molecule as either "dextro-" or "levo-."  Both are controlled substances in Illinois.  There is a test available to distinguish between the D and L isomers, but she did not perform this test on the substanc­es in question.  The substance in the Vicks inhaler contains an L isomer; she is not aware of any other over-the-counter medication that contains methamphetamine with either the D or L isomer.  

Daniel Brown, a privately employed toxicologist, testified for the defense that he reviewed the report prepared by Antonaccio.  His conclusion is that her findings do not necessarily indicate the presence of a controlled substance in the items tested.  Metham­phetamine is a stimulant, and it is sometimes prescribed by doctors for different uses.  L methamphetamine is available in inhalers used for cold medications.  Vicks makes the inhalers, and it also makes inhalers for pharmacies such as Walgreen's and Hook's, which then sell them under their own names.  Since no test was completed to determine whether D or L metham­phet­amine was present in the substances tested by Antonaccio, Brown has no way of knowing whether the substances tested were controlled substances.  Brown testified he has no knowledge of whether the controlled-substances law distinguishes between D and L methamphet­amine.  The federal government has exempted the Vicks inhaler from its list of controlled substances because it does not produce the euphoria and stimulation that D methamphetamine does; it simply dries up the nasal passages and opens the sinuses.  The L metham­phetamine is usually found in the inhaler form, although it is possible to take several inhalers, extract the drug from it, and crystallize it back to a street-drug form.  However, it is Brown's understanding that since it is L methamphetamine, it would still not be a controlled substance, although he admitted he did not review the federal statutes before his testimony and he is not an attorney.  Brown was shown a copy of federal regulations listing the Vicks inhaler as an excluded substance.  

Brown testified that the Vicks inhaler is the only excluded methamphet­amine substance.  The other excluded substances are mainly phenobarbital.  He is unaware of any form of the L methamphetamine available for over-the-counter medications other than the Vicks inhaler.  

Defendant testified that he has a heart condition and has used small amounts of methamphetamine for medicinal purposes.  He also takes nitroglycerin.  He admitted he drove the truck on the night in question but denied that his driver's license was revoked.  Defendant admitted purchasing controlled substances over the last few years but stated that they were for his heart condition.  He does not use drugs to get "high."  He admitted having the metham­phetamine in his possession when he was arrested.  

On cross-examination, defendant stated that within the last 10 years he had convictions for residential burglary and burglary and had spent time in the Department of Corrections (DOC).   Antonaccio testified in rebuttal that under Illinois law both D and L methamphet­amine are controlled substances unless they are on the list of excluded substances.  That list includes the Vicks inhaler; the substance must be in the inhaler.  The substanc­es found on defendant are not excluded and are controlled substanc­es.  The state and federal exclusions are the same.  

Following the conclusion of all evidence, the jury returned verdicts of guilty on both counts.  Defendant's posttrial motion was denied and he was sentenced as stated.  This appeal followed.

Defendant first argues that the State failed to prove beyond a reasonable doubt that the substances found in his possession were in fact controlled substances because there was no proof that the methamphet­amine contained the D isomer.  Defendant contends that methamphetamine containing the L isomer is not a controlled substance under Illinois law.  

A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfac­tory that it creates a reasonable doubt of the defendant's guilt. 
People v. Collins
, 106 Ill. 2d 237, 261, 478 N.E.2d 267, 276 (1985).  When pre­sented with a chal­lenge to the sufficiency of the evi­dence, a reviewing court will sustain a criminal conviction if "'after viewing the evidence in the light most favorable to the prosecu­tion, 
any
 rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  (Emphasis in original.)  
Collins
, 106 Ill. 2d at 261, 478 N.E.2d at 920, quot­ing 
Jackson v. Virginia
, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979).

In order to prove defendant guilty of unlawful possession of a controlled substance, the State must prove beyond a reason­able doubt that the substance possessed by the defendant is in fact a controlled substance.  This is normally accomplished through chemical testing and expert testimony.  However, where sufficient circumstan­tial evidence exists to convince a fact finder beyond a reasonable doubt that the substance defendant possessed is indeed a controlled substance, expert testimony is not always required.  See 
People v. Eichelberger
, 189 Ill. App. 3d 1020, 1027, 546 N.E.2d 274, 278 (1989); 
People v. Ortiz
, 197 Ill. App. 3d 250, 255, 554 N.E.2d 416, 420 (1990).  

Defendant cites section 214 of the Illinois Controlled Substanc­es Act (Act) (720 ILCS 570/214 (West 1992)), which excludes from all schedules of the Act those substances excluded from the schedules of the federal Controlled Substances Act (21 U.S.C. §801 
et
 
seq
. (1994)), pursuant to section 1308.22 of title 21 of the Code of Federal Regula­tions (Code) (21 C.F.R. §1308.22 (1994)).  That section of the Code excludes "I-Desoxyephedrine" (21 C.F.R. §1308.22 (1994)), which is a diluted isomer of methamphetamine.  
United States v. Martinez
, 950 F.2d 222, 223 (5th Cir. 1991).  This substance is contained in the Vicks inhaler.  Defendant argues that under the plain language of the regulation, it is the substance itself which is excluded, not the container in which it is held.  He further complains that any other interpreta­tion would effective­ly criminalize possession of L metham­phet­amine contained in inhalers other than the Vicks-brand inhaler.  We find no merit in defendant's argument.  The regulation clearly states that the "Vicks Inhaler" manufactured by Vicks Chemical Company may be lawfully sold over the counter without a prescription and is therefore excluded from all sched­ules.  21 C.F.R. §1308.22 (1994).  The form of the product excluded is designated as the inhaler.  The Vicks inhaler is one of several products listed in the regulation, all designat­ed by brand name, manufactur­er, and the form in which the substance may be used.  The regula­tion could not be more clear.  As to defendant's argument that the regulation would punish those in possession of inhalers containing metham­phet­amine other than the Vicks brand, we note that this is purely a hypothet­ical argument not available to defendant here.  He was not charged with posses­sion of a substance contained in an inhaler.  See 
People v. Wisslead
, 108 Ill. 2d 389, 397, 484 N.E.2d 1081, 1084 (1985).  

We also disagree with defendant's argument that metham­phet­amine with the L isomer is not a controlled substance under Illinois law.  It is irrelevant which isomer is present; metham­phetamine is a controlled substance unless used in the approved form, 
i.e.
, in the Vicks inhaler.  The removal of the over-the-counter form of L metham­phet­amine found in the Vicks inhaler from the schedule of banned controlled substances did not result in the removal of methamphetamine in general from the list of proscribed con­trolled substances.  
Martinez
, 950 F.2d at 223; 
United States v. Walker
, 960 F.2d 409, 414-15 (5th Cir. 1992); 
United States v. Durham
, 941 F.2d 886, 889 (9th Cir. 1991).  

Even if we agreed that the State failed to prove the illegali­ty of the substance through chemical testing, we would find the circum­stan­tial evidence sufficient to meet the State's burden.  Defendant admitted at trial that the substances in his possession were in fact metham­phetamine.  He testified that he had bought methamphet­amine in the past from people on the street and that he used it for medicinal purposes.  When he was first arrested and the officers began to search him, he attempted to get the officers to allow him to use the rest room, which could be interpreted as a desire to dispose of the methamphetamine before the officers found it on his person.  When the vial was found, defendant told the officers the substance it contained was his nitroglycerin.  He then attempted to convince the officers to allow a waitress at the donut shop to keep his personal effects for him.  The manner in which defendant carried some of the substances also tended to support the inference that the substances were illegal.  For instance, one of the officers testified that in his experience a snow seal was indica­tive of illegal drugs.  There was no evidence that defendant used the substances for any purpose that a Vicks inhaler would be used and, as stated earlier, this is the only nonprescrip­tion legal use of metham­phetamine.  Thus, we reject defendant's argument that he was not proved guilty beyond a reason­able doubt of possessing a banned controlled substance.

Defendant next argues that a limited remand is necessary to determine whether he was denied due process of law by the failure to afford him a fitness hearing because he was ingesting psycho­tropic drugs during the pendency of the case.  He points to isolated references to psychotropic medications in medical records from Blessing Hospital, which were presented to the trial court at sentencing.  According to defendant, the records show he had a cardiac catheterization in February 1994 and again in June 1995, for which Valium was prescribed.  In March 1994 he was given Elavil.  In January 1995, defendant was given Librium in connection with burns he received in his garage fire.  Defendant was charged with the instant offenses in November 1994, his trial took place in September 1995, and he was sentenced in November 1995.  Defendant argues that since it is not clear whether he was still taking these medications at a time proximate to his trial and sentencing, the limited remand is necessary to determine whether he should have received a fitness hearing.  

Section 104-21(a) of the Code of Criminal Procedure of 1963 (Procedure Code) (725 ILCS 5/104-21(a) (West 1992)), in effect at the time of defendant's arrest, provides that a defendant  receiving psychotropic medications under medical direction is entitled to a hearing on the question of his or her fitness while under the medication.   Failure to provide this hearing results in a denial of due process and requires reversal of the conviction and a new trial.  
People v. Birdsall
, 172 Ill. 2d 464, 476, 670 N.E.2d 700, 706 (1996).  In the event it cannot be determined whether defendant's ingestion of psychotropic drugs was sufficient­ly proximate in time to trial or sentenc­ing, a limited remand is required to determine this factual issue.  
People v. Kinkead
, 168 Ill. 2d 394, 415, 660 N.E.2d 852, 861 (1995).  

We disagree with defendant's contention that the existence of the above-noted isolated references in his voluminous hospital records is sufficient to trigger a remand for a determina­tion of whether he was entitled to a fitness hearing.  The records consist of approximately 200 pages of handwritten and typewritten entries from defendant's various hospitalizations.  Defendant stated he was tendering the records in mitigation in connec­tion with his heart condition.  The trial court commented that since the State did not intend to put on any contrary evidence, the court would simply give credence to defendant's oral statements concern­ing his condition. 
Defendant then asked that the court send the records on to the DOC should he be incarcer­ated there.  The court indicated the records would be made a part of the presentence report and, for that reason, it would take a look at the records.  There is nothing in the presentence report that shows defendant was taking any medication at the time of sentencing.  Defendant was incarcerated in the county jail between his convic­tion and sentencing, and the jail report does not indicate he was taking any medication while there.  

The last time defendant took any of these drugs was in  June 1995, three months prior to his trial.  At that time, he took Valium, which was prescribed as a preoperative medication, prior to a specific medical procedure.  There is nothing in the record to suggest that defendant continued taking Valium (or any other psychotropic drug) after that procedure was completed.  We are not willing to assume, absent some evidence, that defendant continued taking psychotropic drugs after June 1995.  Thus, no remand is necessary.

Defendant's last argument is that the trial court erred in ordering him to pay $300 toward the fees of his appointed counsel without an evidentiary hearing to determine whether he was able to pay any of the fees and what amount was reasonable.   

Sections 113-3.1(a) and (c) of the Procedure Code (725 ILCS 5/113-3.1(a),(c) (1992)) provides that the trial court may order a defendant to pay a reasonable sum in reimbursement to the county or state when the court has appointed counsel for the defendant.  The court is to conduct a hearing on the issue of reimbursement and is to consider the defendant's financial affidavit and any other information that may be relevant.  The court may order payment from any cash bond posted for the defendant and, in doing so, may give consideration to the interests of third parties who may have supplied the money to post the bond.    

The State argued in its brief in the instant case that defendant waived consideration of this issue because he failed to object to the trial court's reimbursement order and include a claim of error in a postsentencing motion.  Our original opinion agreed with the State on the waiver argument but, on the merits, held that the trial court did not err in failing to conduct an evidentiary hearing into defendant's ability to pay, based upon our prior decisions in 
People v. Baker
, 195 Ill. App. 3d 785, 552 N.E.2d 421 (1990), and 
People v. Nunez
, 197 Ill. App. 3d 332, 553 N.E.2d 1123 (1990).  However, our supreme court has overruled this portion of our decision and remanded to us for reconsideration of this issue in light of 
People v. Love
, 177 Ill. 2d 550, 564, 687 N.E.2d 32, 38-39 (1997).  
People v. Hanna
, 175 Ill. 2d 539, 688 N.E.2d 309 (1997) (nonprecedential supreme court supervisory order).  In 
Love
, the court held that section 113-3.1 of the Procedure Code requires the trial court to conduct an evidentiary hearing into a defendant's actual financial ability to pay a reimbursement order.  No longer may trial courts rely on the existence of a cash bond as conclusive evidence that a defendant has the financial ability to reimburse for appointed counsel fees.  

     In 
Love
, which also overruled 
Baker
, and 
Nunez
, a cash bond was posted for the defendant by a third person.  After defendant was convicted, the presentence investigation revealed that he was unemployed, supported by his grandparents, and had medical debts.  After sentencing defendant to prison, the trial court 
sua
 
sponte
 ordered defendant to pay $1,000 for the services of the public defender, to be withheld from the cash bond posted on defendant's behalf.  No hearing was held on the issue of reimbursement.  The appellate court vacated the reimbursement order and remanded for a hearing.  The supreme court granted the State's petition for leave to appeal and affirmed the appellate court.

The supreme court held that the trial court must hold a hearing on the defendant's financial condition prior to entering any reimbursement order, regardless of whether a cash bond has been posted on defendant's behalf.  The 
court relied on the plain language of the statute and its history.  The 
Love
 court noted that it had held unconstitutional the predecessor to the current statute in 
People v. Cook
, 81 Ill. 2d 176, 407 N.E.2d 56 (1980).  That  statute (Ill. Rev. Stat. 1979, ch. 38, par. 110-7(g)) provided that any cash bond posted for a defendant could be used to reimburse for appointed counsel fees.  It contained no mechanism for a hearing or consideration of the defendant's ability to pay.  The supreme court held that the statute ran afoul of the constitutional guarantee of equal protection and it also violated a defendant's due process rights because of the failure to provide for any inquiry into the defendant's ability to pay.  
Cook
, 81 Ill. 2d at 187, 407 N.E.2d at 61.  
Love
 stated that section 113-3.1 of the Procedure Code was enacted to remedy those constitutional deficiencies and require that a hearing on the defendant's ability to pay be held prior to entering a reimbursement order. The hearing must focus on the foreseeable ability of the defendant to pay reimbursement and what amount of reimbursement is appropriate.  
Love
, 177 Ill. 2d at 563, 687 N.E.2d at 36.  The supreme court also rejected the State's argument that the defendant in 
Love
 had waived any claim of error in the reimbursement matter, since the defendant did not object to the trial court's reimbursement order.  The supreme court noted that application of the waiver rule was inappropriate in light of the fact the trial court ignored the statutory procedures mandated for a reimbursement order and instead ordered reimbursement 
sua
 
sponte
 without any warning to the defendant, as if doing so were merely a perfunctory exercise to be performed in every case, regardless of the defendant's ability to pay.  
Love
, 177 Ill. 2d at 564-65, 687 N.E.2d at 39.

In the instant case, the trial court 
sua
 
sponte
 ordered defendant to pay $300 in reimbursement for appointed counsel's services, to be deducted from the cash bond posted for defendant.  There was no inquiry into defendant's current or future ability to pay; thus, the situation in the instant case is very similar to that in 
Love
.  We also note that in a pretrial hearing, the trial court advised defendant that he could be ordered to repay the county for public defender costs.  The court said to defendant, "If you gain income or assets, you may be required to repay the cost for a public defender."  Yet in entering the order in the manner it did, the trial court failed to determine whether defendant had gained income or assets.  Clearly, this was in violation of the statute, as interpreted by the supreme court.  

We also reject the State's argument that defendant waived any claim of error in the reimbursement order by not objecting in the trial court or filing a postsentencing motion objecting to the order.  The court entered the order without warning to defendant and completely ignored the requirements of the statute for a hearing on defendant's ability to pay.  

We therefore vacate the trial court's reimbursement order and remand to that court to hold a hearing in accordance with section 113-3.1 of the Procedure Code as to defendant's present and foreseeable future ability to pay any reimbursement order and what amount of reimbursement is appropriate.  We reaffirm the balance of our opinion in this case.  

Affirmed in part, vacated in part and remanded.

KNECHT AND STEIGMANN, JJ., concur.